IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:21CR774 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER JR. |
| | ) | |
| v. | ) | |
| | ) | |
| BRANDON THOMAS KERN, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by its counsel, Rebecca C. Lutzko, United States Attorney, and Margaret Kane, Assistant United States Attorney, respectfully submit this memorandum setting forth the United States' position regarding the sentencing for Defendant Brandon Thomas Kern.  For the reasons set forth below and those to be articulated at the sentencing hearing, the United States submits that a sentence above the guideline range as contemplated in the plea agreement is appropriate in this case.

I.    **FACTUAL BACKGROUND**

Brandon Thomas Kern lied to a minor victim about his true age to gain her trust and obtain nude photographs of the victim.  Kern then coerced the minor victim to agree to meet him in person for sex.  When the victim became scared and did not want to go through with Kern's plan, he got aggressive and threatened the minor.  Kern threatened to expose the victim to family and friends if she did not comply with Kern's plan to have sex.  The victim went to great lengths to try to get Kern to stop including saying she was eleven years old and telling him that she was going to commit suicide if Kern did not stop. Kern still persisted and rented a car to drive from

New York to Ohio to have sex with the 14-year-old minor victim. Kern came prepared to carry out his sexual plan with lubricant, condoms, rope, and knives.  The minor victim them realized Kern actually took steps to carry out his plan and had a panic attack before alerting her parent and school.

This was not an isolated incident as law enforcement discovered that Kern had a pattern of contacting minors on social media, lying about his identity, obtaining nude photographs of minors, and threatening to expose minor victims if they did not comply with his plans to meet for sex or obtain more nude photographs and videos.  Based on the breadth and gravity of Kern's conduct, the United States is requesting an upward variance from the sentencing guideline range contemplated in the parties' plea agreement and asks for a sentence of 180 months.  To support its sentencing position, the United States offers the following summary of Defendant Kern's conduct. The United States also refers the Court to the description included in the Presentence Investigation Report ("PSR") (R. 36: PSR, PageID 154-58).

## STATEMENT OF FACTS

Kern began communicating with thirteen-year-old Victim-1 on September 15, 2021.  (R. 36: PSR, PageID 155).  Kern first contacted Victim-1 on Instagram and they then started to talk on Snapchat.  Kern lied and told Victim-1 that he was 16-years-old, when he was in fact 27.  (*Id.*).  Kern told Victim-1 he wanted to engage in sexual intercourse with her in person.  (*Id.*).  Kern asked Victim-1 to send him nude photographs of herself.  (*Id.*).  Victim-1 complied and sent five photographs of her breasts.  Shortly after, Kern became aggressive and asked for more sexually explicit pictures.  Kern also asked Victim-1 to meet him and repeatedly asked for the minor's address.   Victim-1 became scared and blocked Kern on Shapchat.

Kern persisted and made another Snapchat handle to contact Victim-1.  (*Id.*).  Kern told Victim-1 that if she did not speak to him, he would disseminate her nude pictures to her friends on Instagram.  Kern repeatedly threatened Victim-1 that he would "expose" her by sending the pictures to friends, parents, and school officials if Victim-1 did not meet him for sex.  Below are photographs of text messages between Victim-1 and Kern recovered from the victim's phone showing how Kern threatened to expose the minor Victim if she did not comply.







4









6











The victim was terrified that her friends, family, and school administrators would find out that she sent nude photographs to Kern.  Victim-1 was desperate to get Kern to stop and even went as far as telling him that she was having suicidal thoughts.  Even these pleas did not stop Kern from pressuring minor Victim-1 to meet him for sex.









Kern also created a "tally system" where Victim-1 would receive a "tally" if she did not

listen to Kern or was disrespectful.  Kern told Victim-1 that if she got 10 tallies, she had to have

anal sex with him.  (*Id.*).  Victim-1 repeatedly told Kern that she was only 14 years old.[1]  At one point, the victim told Kern that she was only 11 years-old in hopes that this would get Kern to stop. Kern replied that he would still meet Victim-1 for sex even if she was only 11.  (*Id*).



---

[1] Victim 1 was thirteen years old when she began talking to Kern and turned fourteen during the course of this incident.





On October 7, 2021, even after Victim-1 begged Kern to stop, Kern rented a car and drove from New York to Ohio to have sex with Victim 1.  (*Id.*).  Kern told Victim-1 on Snapchat that he was in Ohio and sent pictures of a hotel room and a Snapchat video of Victim-1's school

campus. The reality of Kern's actual arrival in Ohio caused Victim-1 to have a panic attack at school and her mother and police became involved.

Police located Kern's car at the hotel where he was staying. (*Id.*). Kern was arrested leaving the hotel room on his way to meet Victim-1. Police found lubricant and condoms in Kern's hotel room. Police also found masking tape, rope, and knives in Kern's luggage. Kern had earlier told Victim-1 he wanted to tie her up with a rope during sex because it was "hotter that way". (*Id.*).

Kern admitted that he traveled from Bayport, New York to meet Victim-1 for sex. (*Id.*, PageID 156). Kern claimed that he thought that Victim-1 was 18 years-old and was only role playing that she was younger. Kern admitted he had been in contact with Victim-1 for approximately three to four months and that the conversation turned sexual almost immediately. (*Id.*). Kern stated he did not like to waste people's time because he was a "freak" and wanted people to know that up front. Kern stated he was interested in domination, sadism, and masochism. (*Id.*). Kern admitted he brought rope, condoms, and lubricant to have sex with Victim-1.

### Kern communicates and solicits nude pictures from other minors

Police obtained a search warrant for Kern's Snapchat accounts. (*Id.*). One of Kern's accounts, bsublime20, contained 8,308 images. Kern saved 7,756 of these images. The account's friends list had 2,461 friends with mainly presumed female usernames. Many of these users sent images and videos of sexually explicit material. (*Id.*). The FBI identified seven of these minor victims and five were located and interviewed.

Victim-2 told Kern that they were 14 years old. Kern sent the victim a picture of himself in a football uniform and lied that he was 16 years old. (*Id.*). Kern and Victim-2 talked, and the

14

victim felt pressured to send Kern pictures.  Kern saved a video of the victim masturbating and of their genital area. Victim-2 was scared and embarrassed and did not tell anyone what had happened.  (*Id.*).

Victim-3 also met Kern on Snapchat.  (*Id.*, PageID 157).  Kern told this victim that he was 17 years-old and did not go to school.  Kern knew that this victim was 14 years old and knew their full name, address, and birthdate.  (*Id.*).  Kern asked the victim for nude pictures and also sent her "dick" videos and images of himself.  Victim-3 met with Kern in person once in New York to have sex.  Kern gave Victim-3 a marijuana edible which made them sick, and no sex occurred.  Victim-3 was scared that Kern would leak videos and pictures if they did not keep sending Kern pictures.  (*Id.*).

Victim-4 started talking to Kern when they were 13 years old.  (*Id.*).  Kern told this victim that he was 16 years old.  Police found a saved video of Victim-4 masturbating in Kern's Snapchat account that she had previously sent to Kern.  Victim-4 stated that Kern kept asking for nude photographs and they eventually sent more to him.  Victim-4 eventually blocked Kern. (*Id.*).

Victim-5 was 14 years old when they started talking to Kern on Snapchat. Snapchat records show that Kern saved approximately 10 sexually explicit videos and images of this victim.  Victim 6 also recalled Kern asked her for photographs and videos.  Pictures of Victim 6 were located in Kern's Snapchat account.  (*Id.*).

Kern's pattern was the same when talking to all of these minor victims.  (*Id.*).  Kern talked to multiple minor females between 12 and 15 years of age.  Kern asked for photographs of the victims to see what they looked like.  Kern then started having sexual conversations with the minors to get more images or try to meet up with the minor victims.  (*Id*)  Kern often liked about

15

his age, lying that he was 16 or 17 years old so that the victims felt more comfortable sending him images. (*Id*). Once Kern received some photographs and earned the victims' trust he then became relentless in asking for more images. When the minor victims did not comply, he threatened to expose them by sending images and videos to parents and friends. (*Id.*).

KERN'S PROPERLY CALCULATED ADVISORY GUIDELINES RANGE

Kern's United States Sentencing Guidelines calculation, after acceptance of responsibility, places him at a Criminal History Category I with an offense level of 34. (R. 36: Sealed PSR, PageID 159). This results in an advisory sentencing range of 151-188 months. The offense which he plead guilty to, 18 U.S.C. § 2422(b), carries with it a mandatory minimum sentence of ten years and the maximum term is life.

The stipulated guideline calculation in the plea agreement differs from the calculation in the PSR. (R. 36: PSR, PageID 154, 59). The difference between the two calculations is that the PSR applies a five-level enhancement under § 4B1.5, that Kern engaged in a pattern of activity involving prohibited sexual conduct. The government believes that this enhancement is properly applied and made an error in not including it in the written plea agreement. U.S.S.G. § 4B1.5(b) provides that if a defendant's instant offense of conviction is a covered sex crime, and the defendant engaged in a pattern of activity involving prohibited sexual conduct the five-level enhancement applies. Kern's conviction for Enticement, 18 U.S.C. § 2422(b) is a violation under chapter 117 and qualifies as a covered sex crime. Kern also engaged in a pattern of activity since he engaged in prohibited sexual conduct with a minor on at least two separate occasions. Kern's conduct with Minor Victims 2, 3, 4, 5, and 6 involved the production of child pornography as he asked them to produce and send images of themselves in sexually explicit

photographs.  (R. 36: PSR, PageID 157).  This occurred with multiple victims across multiple dates.

Therefore, to uphold its obligations under the plea agreement, the Government asks that this Court apply an upward variance from the guideline calculation in the plea agreement of 87-108 months and impose a sentence of at least 180 months, or 15 years.

## II.    APPLICATION OF § 3553(A) FACTORS

### A.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

The Government refers to the Statement of Facts section above and the Defendant's PSR for descriptions of the nature and circumstances of the offenses in the case at bar.

It is clear from the victim impact statements submitted by Victim-1 and her parent the devastating effects this had not only in the minor victim but her entire family.  Victim-1 details the effects that Kern's actions had on her life including constant bullying and rumors at school. Victim-1 considered taking her own life because of Kern's actions.  Victim-1 attends counseling to deal with what occurred and will struggle and continue to deal with the effects for the rest of her life.  Victim-1's parent also details the impact that this event had her as a parent.  This includes realizing that her child could have been sexually assaulted or abducted by a twenty-seven-year-old man.  Both Victim-1 and her parent ask for Kern to receive a sentence to keep him off the streets unable to harm any other children for a very lengthy time.

Kern cannot argue that this was one poor decision he made with only Victim-1.  The other minors discovered in Kern's Snapchat account shows his pattern of lying to minors to induce them to send photographs.  Kern also has a pattern of threatening to expose minors to friends and family if they do not comply with his demands.  Kern not only attempted to get

17

photographs of these minors, but went one step further and attempted to meet up with the minors to have sex.

Even if this Court only considers Kern's conduct dealing with Victim-1, the facts and circumstances related to the charged in Count 1 justify an upward variance.  Kern first lied about his age and told Victim-1 he was also a minor so that she was more comfortable sending him images and speaking to him over Snapchat.  Kern then persisted in threatening and harassing Victim-1 to send more pictures and meet him for sex.  The minor victim truly felt she had no other choice but to listen to Kern and meet up for sex.  One must put themselves in the shoes of this fourteen-year-old minor to fully understand the true fear of being exposed to family, friends, and school administrators that a child of this age would feel.  Kern's desperation shows in the messages above and show that he could not be stopped even when Victim-1 expressed that she wanted to commit suicide and stating that she was eleven-years old.  Lastly, Kern's actions went well past just words over the computer.  Kern took the extra steps of buying supplies, renting a car, and driving to Ohio to have sex with Victim-1.  Kern continued to threaten to expose this minor victim to ensure that she would show up to have sex with him, a 27-year-old adult.

B.  HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Kern's parents divorced when he was two or three years old, and his childhood was "rough" at the beginning.  (R. 36: PSR, PageID 160).  His childhood got better when his mother remarried and he was raised in an upper middle-class neighborhood with no drug use, violence, or abuse.  (*Id.*).  Kern has never been married and has no children.  He has lived in Suffolk County, New York, for most of his life.  (*Id.*).

Kern is in good physical health and has never been treated or diagnosed with any mental health issues.  (*Id.*, PageID 162).  Kern overindulged in alcohol in college but stopped and has no other substance abuse issues.  Kern graduated from high school and attended some college.  (*Id.*).  He has worked for his father and stepfather's businesses.  He is skilled at building, masonry, and cabinetry building.  (*Id.*).

C.     <u>NEED FOR THE SENTENCE IMPOSED TO REFLECT SERIOUSNESS OF OFFENSE, PROMOTE RESPECT FOR THE LAW, AND PROVIDE JUST PUNISHMENT</u>

This factor is known as the "just desserts" concept, answering the need for retribution so that the punishment fits the crime and the defendant is punished justly. *See* <u>United States v. Irey</u>, 612 F.3d 1160, 1206 (11th Cir. 2010).  The <u>Irey</u> court cited the Senate Report regarding this provision:

> This purpose—essentially the "just desserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a typelength that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. (quoting S.Rep. No. 98-225, at 75–76, 1984 U.S.C.C.A.N. 3258-59). Id.

In <u>Bistline,</u> the Sixth Circuit noted a reasonable sentence must reflect the seriousness of the offense and provide for any general or specific deterrence. <u>United States v. Bistline</u>, 665 F.3d

D.     <u>THE NEED FOR THE SENTENCE IMPOSED TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT</u>

This is the factor involving the incapacitation or specific deterrence of the defendant that the court is to consider. See <u>Irey</u>, 612 F.3d at 1210.  Congress and this Circuit have recognized that sex offenders have a high rate of recidivism.  Notably, the Sixth Circuit stated in United <u>States v. Richardson</u>, 349 Fed. Appx. 38, 44 (6th Cir. 2009), that there are, "long-standing

concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision

periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose

criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to

disappear within a few years of release from prison. Richardson, 349 Fed. Appx. 38, 44 (6th Cir.

2009) (quoting, H.R.Rep. No. 108-66, at 49-50 (2003) (Conf.Rep.), reprinted in 2003

U.S.C.C.A.N. 683, 684.).

> As Judge Posner wrote:

>> We need evidence-driven law just as we need evidence-driven medicine. Statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children. R. Karl Hanson, Kelley E. Morton & Andrew J.R. Harris, "Sexual Offender Recidivism Risk: What We Know and What We Need to Know," 989 Annals of the N.Y. Academy of Sciences 154, 157 (2003) (tab.1).  Some studies show a high rate of recidivism among pedophilic sex offenders generally, ranging from 10 percent to 50 percent.  Ryan C.W. Hall & Richard C.W. Hall, "A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues," 82 Mayo Clinic Proceedings 457, 467 (2007).  Another study found that only 6.8 percent of consumers of child pornography had been charged with a new child pornography offense within 4 years but that the percentage rose to 9.5 percent within 6 years. Angela W. Eke, Michael C. Seto & Jennette Williams, "Examining the Criminal History and Future Offending of Child Pornography Offenders: An Extended Prospective Follow up Study," Law & Human Behavior, Nov. 19, 2010 (tab.1), www.springerlink.com/content/h4616862621x8616/ (visited June 23, 2011). United States v. Garthus, 652 F.3d 715, 720 (7th Cir. 2011) (emphasis supplied).

Further, these estimates of recidivism may actually be low, as is acknowledged as a

limitation by Eke, Seto, & Williams, "Our reliance on official records for both criminal history

and re-offending may have limited the strength of the association that we could find, as both are

underestimates of true offending."  Eke, Seto, & Williams, "Examining the Criminal History and

Future Offending of Child Pornography Offenders: an Extended Prospective Follow-Up Study,"

*Law and Human Behavior* 17 (2011). And they admit that, "[h]istorical cases of sexual contact offenses, especially those committed by child pornography offenders who appeared to have no prior criminal history, may provide a window into undetected sexual offending, i.e., offenses that were not (at the time) reported to police or documented in file information." Id.

Therefore, since recidivism is defined in terms of subsequent arrests, low numbers of contact offenses based upon arrests is not surprising. These results are explained by multiple factors. First, child molesters do not boast about their crimes to the general public, but only between themselves. Second, victims of sex crimes are reluctant to report such crimes because children are particularly reluctant to talk about sexual abuse. Bonta & Hanson, "Gauging the Risk for Violence: Measurement, Impact and Strategies for Change" (1994) (published by the Solicitor General Canada, Ministry Secretariat (Ottawa)); see e.g. Hanson & Bussière, "Predictors of Sexual Offender Recidivism" (1996) (published by the Solicitor General Canada, Ministry Secretariat (Ottawa)). Therefore, any study which relies on subsequent arrest and convictions should be considered with caution.

The issue of recidivism begs the question of whether someone with a sexual attraction to children can be] rehabilitated? Pedophilia generally is treated with cognitive behavioral therapy. *See, A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, Ryan C. W. Hall, Md, and Richard C. W. Hall, Md, PA, Mayo Clin. Proc. (April 2007). The therapy may be prescribed alone or in combination with medication. Id. But unlike the successful treatment outcomes for most other mental illnesses, the outlook for successful treatment and rehabilitation of individuals with pedophilia is guarded. Id.

In summary, no study can confidently predict for the Court whether Kern will commit a future child exploitation offense. Through his behavior, statements, and social media, Kern has

evidenced his sexual attraction to children and appears to have invested a significant amount of time grooming and threatening children for images. This should give the Court great pause when evaluating the likelihood that Kern will recidivate in the future.

## III. MONETARY PENALTIES

### A. FINE

The Government concedes Kern does not have the current ability to pay a fine in this matter and suggests that any analysis of Kern's future ability to make money should be directed toward his special assessment responsibilities.

### B. 18 U.S.C. § 3014 ADDITIONAL SPECIAL ASSESSMENT

Kern is also subject to a mandatory $5,000 Additional Special Assessment under 18 U.S.C. § 3014. The statute states, in pertinent part:

> Beginning on the date of enactment of the Justice for Victims of Trafficking Act of 2015 and ending on September 30, 2019, in addition to the assessment imposed under section 3013, **the court shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under**—
>
> **(1)** chapter 77 (relating to peonage, slavery, and trafficking in persons);
>
> **(2)** chapter 109A (relating to sexual abuse);
>
> **(3) chapter 110 (relating to sexual exploitation and other abuse of children)**;
>
> **(4)** chapter 117 (relating to transportation for illegal sexual activity and related crimes)....
>
> 18 U.S.C. § 3014(a) (emphasis added).

These assessments are deposited in the Domestic Trafficking Victims' Fund and awarded as grants or enhanced programming for victims. 18 U.S.C. §§ 3014(c) and (e)(1). Because Defendant has been convicted of an offense under Chapter 110, the Court must impose this

additional special assessment unless it finds he is unable to pay; however, both Defendant's current and <u>future</u> financial status is to be evaluated when making the indigency determination under § 3014.  See <u>United States v. Shepherd</u>, 922 F.3d 753 (6th Cir. 2019).  See also  <u>United States v. Janatsch</u>, 722 F. App'x 806, 810-11 (10th Cir. 2018).  That is, negative net worth at the time of sentencing is not dispositive of the issue.  <u>United States v. Kelley</u>, 861 F.3d 790, 801-802 (8th Cir. 2017).  If "at some point" a defendant would be able to pay the Additional Special Assessment, "[t]his ability to earn money in the future preclude[s] a finding of indigence for purposes of § 3014."  *Id*.

Even in the absence of assets, Defendant will be in prison for at least the next 10 years, and during that time, he can participate in the IFRP, which affords him the future ability to pay both the fine and additional special assessment.  In fact, the fine will not expire for 20 years from the date of his release from custody. 18 U.S.C. § 3613(b).  In addition, he demonstrates future potential employability, both in the institution and beyond, with which to make payments. Kern is a high school graduate and attended some college (R. 36: PSR, PageID 162).  He has also worked for his father and stepfather at their businesses, and he is stilled at building, masonry work, and cabinetry building.  (*Id.*).  Consequently, Kern should be ordered to pay the $5,000 additional special assessment.

IV.     **CONCLUSION**

For these reasons and those to be articulated at the sentencing hearing, the United States respectfully requests that the Court impose a term of imprisonment of at least 15 years, or 180 months which is an upward variance from the guideline calculation as calculated in the plea agreement.  If the Court adopts the guideline calculation in the PSR of 151-188 months, a 180-month sentence is a sentence within the guidelines.

Respectfully submitted,

REBECCA C. LUTZKO
United States Attorney

By:     /s/ Margaret A. Kane
        Margaret A. Kane (OH: 0082084)
        Assistant U.S. Attorney
        801 West Superior Avenue, Suite 400
        Cleveland, Ohio 44113
        Tel. No. (216) 622-3624
        E-mail: margaret.kane@usdoj.gov
